# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIA McCLELLAN, | ) 1:05cv0050 JMD |
| | ) |
| Plaintiff, | ) ORDER REGARDING DEFENDANT'S<br>) MOTION FOR REMAND OF PLAINTIFF'S<br>) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) (Document 15) |
| MICHAEL J. ASTRUE, Commissioner<br>of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **BACKGROUND**

Plaintiff Julia McClellan ("Plaintiff") sought judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income ("SSI") pursuant to Title II of the Social Security Act. The Commissioner filed a Motion for Remand to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). The motion is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On May 13, 2005, the Honorable Anthony W. Ishii reassigned the case to the Honorable Sandra M. Snyder for all purposes. On June 8, 2007, the Honorable David F. Levi reassigned the case to the undersigned for all purposes.

# FACTS AND PRIOR PROCEEDINGS[2]

On January 30, 2003, Plaintiff filed for disability insurance and benefits. AR 93. She alleged disability since June 20, 2000, due to degenerative disc disease/arthritis of the cervical spine. AR 84. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 44-47, 49-53, 56. On January 22, 2004, ALJ Laura S. Havens held a hearing. AR 23-41. ALJ Havens denied benefits on July 28, 2004. AR 12-22. On December 2, 2004, the Appeals Council denied review. AR 6-9.

On January 10, 2005, Plaintiff filed a Complaint in this Court against the Commissioner of Social Security. On October 6, 2005, the Commissioner of Social Security filed a Motion for Remand. Thereafter, on October 7, 2005, Plaintiff filed her Opposition to the Commissioner's Motion for Remand.

Hearing Testimony

On January 22, 2004, ALJ Havens held a hearing in Stockton, California. AR 23. Plaintiff appeared with her attorney, Robert Louis.[3] AR 25. Vocational Expert ("VE") Susan Moranda also appeared and testified. AR 35-39.

Plaintiff was born on March 19, 1959. AR 26. She has a high school education. AR 26. She can read the newspaper and do simple adding and subtracting. AR 26-27. Plaintiff put the date of June 20, 2000, as the date of disability because she got so debilitated with neck pain, fibromyalgia, and fatigue that she could no longer work. AR 27. She testified that she had a prior disability application that was denied. AR 27. She did not appeal that denial to the hearing level. AR 27.

In 2002, Plaintiff worked for five months as a registered nurse and earned approximately $8,400.00. AR 27-28. She quit because of fatigue and pain. AR 28. In 2001, she worked for approximately three months as a clerk at Home Depot earning approximately $1,200.00. AR 27-28. She quit because of fatigue and pain. AR 28.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] Plaintiff's attorney is identified in the record as "Robert Lewis" and "Robert Louis." For convenience, the Court will designate him as "Robert Louis."

Plaintiff suffers from back pain, Hepatitis C and fibromyalgia. AR 28. She has degenerative disk disease, which is inoperable, in four levels of her neck. AR 28-29.

Plaintiff worked as a registered nurse from 1983 to 1999 and again in 2002. AR 28. Plaintiff stopped working on December 2, 2002. AR 29.

Plaintiff lives in a house with her husband and two teenage children. AR 29. She wakes up at 6:00 a.m. AR 29. She has to take medication for pain before she can do anything. AR 29. After she takes her medication, she is able to dress and bathe herself. AR 29. She does not do household chores or any cooking. AR 29. She washes dishes "very minimally." AR 30. She does not mop or vacuum. AR 30. She does not do laundry or yard work. AR 30. She watches T.V. for about eight hours a day. AR 30. She reads for one to two hours a day. AR 30. She likes to read novels, the newspaper and magazines. AR 30. She does not exercise. AR 31. She does not smoke or drink alcohol. AR 31. She drives a car. AR 31. She can drive for thirty minutes. AR 31. She drove to the hearing. AR 31. Plaintiff does not go to church or to the movies. AR 31. She has problems sleeping. AR 31. She is able to sleep four to six hours per night. AR 31.

Plaintiff testified she goes to the doctor twice a month. AR 32. She sees "Dr. Macarovo" and "Dr. Lyon" for pain control. AR 31-32. She takes Avinza, Valium, Vicodin, and "Feuraset." AR 32. She has side effects from these medications--drowsiness, nausea and forgetfulness. AR 32. The medications help "minimally" with the pain. AR 32.

Plaintiff also testified she can walk or stand for ten minutes and sit for fifteen minutes. AR 32. She cannot lift anything. AR 32. She feels pain in her neck, shoulders, arms, hands and legs. AR 33. Her legs, back and torso ache from the fibromyalgia. AR 33. The pain in her neck is sharp, stabbing, shooting and burning. AR 33. The fibromyalgia pain is dull, aching, deep and burning. AR 33. The pain is constant. AR 33. Her pain usually is an eight on a scale of one to ten. AR 33.

In response to questions from her attorney, Plaintiff testified she receives treatment with Fair Oaks Psychiatric Associates. AR 33. Dr. Desai is the doctor. AR 33. She goes once a

month. AR 33. Dr. Desai talks to her and evaluates her depression. AR 33. He gives her medications. AR 34.

Plaintiff contracted Hepatitis-C in 1985 from a patient's blood while she was working in the operation room. AR 34. She did not file a worker's compensation claim. AR 34. As a result of her Hepatitis-C, she has constant fatigue and tiredness. AR 34. She cannot sleep during the daytime because of the pain. AR 34.

Plaintiff testified it took her about 45 minutes to get to the hearing. AR 34. She had to take medication when she arrived because the pain was very severe from driving. AR 34. The pain did not dull her senses and she could understand the ALJ's questions. AR 34.

The VE also testified. AR 35. She listed Plaintiff's past work with the skill and exertional level. AR 35. Plaintiff's work as a nurse was a skilled position, SVP of seven, and a medium exertional category. AR 35. The VE stated nurses often work at a higher level. AR 35.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience. AR 36. This person could sit six hours out of an eight-hour day, stand two hours out of an eight-hour day and walk two hours out of an eight-hour day. AR 36. This person occasionally can lift and carry ten pounds, frequently lift and carry ten pounds, occasionally can push and pull with the upper extremities, and occasionally can climb, balance, stoop, kneel, crouch, crawl and reach overhead. AR 36. The VE testified that this person could not perform Plaintiff's past work. AR 36. The VE also testified there are no jobs in the state or national economy for such a person. AR 36. The only types of positions the VE could identify were sedentary positions. AR 36-37. This person could perform the positions of small parts assembler (7,500 in California) and inspector in the lens optical industry (3,500 in California). AR 37.

At the conclusion of the hearing, the ALJ informed Plaintiff's counsel that she would be sending Plaintiff out for an additional psychiatric evaluation and an additional internal evaluation. AR 39.

<u>Medical Evidence</u>

On April 24, 2000, Plaintiff sought treatment for chronic neck pain in acute care at Sutter Gould Medical Foundation. AR 150. She was diagnosed with "Chronic DJD," degenerative disc disease. The provider prescribed Vicodin and naprosyn. AR 150.

On June 28, 2000, Plaintiff sought treatment from Alexander Davis, M.D., in the Department of Orthopedics at Gould Medical Foundation. She complained of severe neck pain, with pain into her left shoulder and arm. AR 147-149. Upon examination, Dr. Davis noted that gentle motion of her left arm created pain in the left shoulder. There was no swelling, erythema or area of fluctuants. AR 148. Dr. Davis opined that Plaintiff had possible left shoulder bursitis and a history of cervical myofascial pain syndrome. Dr. Davis prescribed Medrol, Soma, and Lortab. He referred Plaintiff to a physical medication specialist for chronic pain management. AR 148. He also ordered an X-ray series of her left shoulder. AR 149.

On July 5, 2000, Plaintiff underwent left shoulder X-rays at Gould Medical Foundation. AR 146. Clifton Choo, M.D., indicated that there was no acute fracture, dislocation, or osseous destructive process of her left shoulder. Her joint spaces were well-preserved and the soft tissues were unremarkable. AR 146.

On July 5, 2000, Plaintiff saw Dr. Davis for complaints of left shoulder and neck pain. AR 145. Plaintiff reported that her husband had taken away all of her pills. Dr. Davis examined Plaintiff and reviewed her X-rays. He assessed her with left shoulder impingement syndrome and myofascial pain syndrome in the left upper extremity and neck. He prescribed Lortab and Soma. He also gave Plaintiff a cortisone shot in her left shoulder. Dr. Davis opined that there was nothing that could be done surgically and Plaintiff may need treatment from a pain management specialist to assist in the myofascial pain. AR 145.

On December 10, 2000, Plaintiff sought treatment in acute care at Sutter Gould Medical Foundation for complaints of a migraine, nausea and vomiting. She was prescribed Fioricet and other medications. AR 144.

On April 10, 2002, Plaintiff sought treatment in acute care for a migraine. The provider noted Plaintiff "looks in discomfort." She was prescribed Fioricet. AR 143.

On June 18, 2002, Plaintiff sought treatment in acute care for complaints of low back pain and chronic sciatic nerve pain causing nausea. She was prescribed medication. AR 142.

On December 12, 2002, Plaintiff saw Dr. Davis, who conducted a physical examination of Plaintiff. AR 138-139. He assessed her with chronic neck pain syndrome, degenerative disease of the cervical spine and myofascial pain syndrome involving the neck. AR 139. Dr. Davis ordered X-ray views of the cervical spine and an MRI scan of Plaintiff's neck. AR 139. He explained to Plaintiff that the extreme tension in her neck muscles was of a myofascial origin and would not respond well to surgery. He opined that she may best be treated by a physical medicine specialist. AR 139.

On January 4, 2003, Plaintiff underwent an MRI of her cervical spine. AR 136-137. Radiologist Dennis W. Boyce, M.D., reviewed the MRI information. He noted evidence of mild degenerative disc disease at C-3/4, and advanced degenerative disc disease at C-4/5, C-5/6, and C-6/7. AR 136-137. He opined that there was no significant change as compared to Plaintiff's MRI scan dated April 24, 1998. AR 137.

On January 17, 2003, Plaintiff saw Dr. Davis following the MRI scan of her cervical spine. AR 134-135. Dr. Davis compared Plaintiff's new MRI scan dated January 4, 2003, with her April 24, 1998, scan. AR 134. Dr. Davis acknowledged Dr. Boyce's statement that there was no significant change, but opined that on the sagittal images Plaintiff's degenerative disk disease was worse, particularly at C5-6 and C6-8. AR 134.

Dr. Davis explained to Plaintiff that at her age a multilevel cervical fusion would be a bad idea. AR 135. He did not recommend surgery. He advised continued treatment with oral medications. Dr. Davis further opined that Plaintiff appeared to be disabled from her chronic pain syndrome. AR 135. He also indicated Plaintiff may obtain some symptomatic relief with heat, stretching, and "perhaps some trigger point injections." AR 135.

On April 25, 2003, Plaintiff sought treatment in acute care for complaints of a migraine. She was prescribed Demerol and other medication. AR 141.

On May 11, 2003, Tri Minh Pham, M.D., completed an internal medicine evaluation of Plaintiff on referral of the Department of Social Services. AR 151-153. Plaintiff complained of

6

neck pain and tightness. AR 151.  Upon examination of her neck, Dr. Pham noted tenderness and tension in the bilateral trapezius muscles.  Dr. Pham determined Plaintiff's neck range of motion as follows:  lateral flexion was 0-30 degrees, forward flexion was 0-30 degrees, extension was 0-30 degrees, and rotation was 0-45 degrees.  AR 152.  Upon examination of Plaintiff's back, Dr. Pham identified no tenderness and normal range of motion.  AR 152.  Dr. Pham opined that Plaintiff presented with chronic neck pain syndrome with decreased range of motion in her neck.  A review of Plaintiff's MRI scan of her cervical spine dated January 4, 2003, showed significant degenerative disc disease.  Dr. Pham opined that Plaintiff still had a lot of pain despite medications and physical therapy.  He indicated that her pain and muscle tightness was typical of fibromyalgia.  He opined that Plaintiff should not lift or carry more than 10 pounds.  AR 152.

On May 15, 2003, George A. Jansen, Sr., M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 154-161.  Dr. Jansen opined that Plaintiff could lift and/or carry 10 pounds occasionally and frequently, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and occasionally push and/or pull.  AR 155. He also opined that Plaintiff never could climb a ladder, a rope or scaffolds and never crawl.  She frequently could balance, occasionally could climb a ramp/stairs, and occasionally could stoop, kneel, and crouch.  AR 156.  She was unable to do overhead work, reach or lift.  AR 157.

On July 18, 2003, Thien Nguyen, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 164-171.  Dr. Nguyen opined that Plaintiff occasionally could lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and occasionally push or pull.  AR 165.  She occasionally could climb, balance, stoop, kneel, crouch, and crawl.  AR 166. She could reach in all directions except for occasional overhead reaching.  AR 167.

On July 23, 2003, Richard E. Plotzker, M.D., wrote a letter indicating Plaintiff was a patient who had been evaluated for hepatitis C.  AR 175.  Dr. Plotzker noted that Plaintiff complained of a fair amount of fatigue, which may have been inhibiting her ability to work.  His most recent evaluation of Plaintiff included liver function tests and hepatic sonography, which

were within normal limits.  A liver biopsy performed in September 2000 showed grade 2 inflammatory change and stage 1 fibrosis.  AR 175.

On August 6, 2003, Plaintiff sought treatment from David Lyon, M.D., at Central Valley Pain Management & Wellness Clinic ("Wellness Clinic").  AR 197-199.  Plaintiff complained of moderately severe neck pain, which radiated to her upper thoracic spine and lateral to her posterior shoulders, anterior shoulders and deltoids.  AR 197.  Pain was relieved by medications and lying down and worsened by activities of daily living and physical work.  Plaintiff also complained of migraine headaches.  AR 197.  Dr. Lyon reviewed the results of Plaintiff's January 4, 2003 MRI of the cervical spine, which showed significant degenerative disc disease associated with small posterior spondylotic ridges at C4-5, C5-6 and C6-7.  AR 198.  Dr. Lyon diagnosed advanced, degenerative disc disease at multiple levels (C4-5, C5-6 and C6-7), mild compromising of neural foramina (bilaterally at C4-5 and C5-6) causing cervical pain and upper back and shoulder pain.  He also diagnosed migraine headaches.  AR 198.  Dr. Lyon refilled Plaintiff's Norco and Zomig prescriptions, discontinued Soma, prescribed Robaxin, and increased her OxyContin dosage.  AR 198.  He also recommended a neurosurgical consultation. AR 198.

On August 18, 2003, Plaintiff saw Dr. Lyon for a recheck.  AR 194-196.  She complained that the medication did not help and her pain scale was 8/10.  AR 194.  Dr. Lyon discontinued her Robaxin medication, he reinstated her Soma prescription, refilled her Fioricet for tension headaches, prescribed Duragesic and continued OxyContin with eventual tapering after her Duragesic dose was underway.  AR 195.

On August 27, 2003, Plaintiff visited the Wellness Clinic complaining of withdrawal symptoms from OxyContin.  AR 192-193.  Plaintiff identified symptoms of nausea, diarrhea, vomiting, sweating and a feeling of illness.  Physician Assistant Kristy Lindstrom prescribed Duragesic and OxyContin.  AR 193.  On August 28, 2003, Ms. Lindstrom again adjusted the dosage of Plaintiff's Duragesic and OxyContin.  AR 193.

On September 11, 2003, Plaintiff saw Dr. Lyon for a recheck on her advanced degenerative disc disease at C4-5, C5-6, and C6-7, with neural foraminal compromise causing

upper back and shoulder pain and migraines. AR 189-191. Plaintiff reported that the OxyContin helped, but she still had more pain. The Duragesic did not help. AR 189. Dr. Lyon discontinued her Duragesic patch and increased her OxyContin. AR 190.

On September 12, 2003, Plaintiff saw Dr. Lyon for a recheck. AR 187-188. Plaintiff complained of irritability and moodiness as side effects from the OxyContin. AR 187. She rated her pain scale as a 3-8/10. AR 187. Dr. Lyon converted Plaintiff from OxyContin to Avinza. AR 188.

On September 22, 2003, Dr. Lyon examined Plaintiff at the Wellness Clinic. AR 185-186. Dr. Lyon indicated that Plaintiff had stopped taking OxyContin and started taking Avinza. She reported no withdrawal effects. AR 185. The Avinza had been taking care of most of her pain fairly well. AR 185. He increased her dosage of Avinza and ordered a refill of her Norco and Valium prescriptions. AR 186.

On October 6, 2003, Plaintiff sought a refill for her Fioricet prescription at the Wellness Clinic. AR 183-184. Plaintiff reported her purse was dumped out at Orchard Supply and she lost her cell phone and Fioricet prescription. Plaintiff complained of a migraine headache, with a pain scale of 9/10. AR 183. Physician Assistant Kristy Lindstrom prescribed Fiorinal. AR 183.

On October 20, 2003, Plaintiff sought treatment at the Wellness Clinic to recheck on her medication refills and her degenerative disk disease. AR 180-182. She reported her pain scale as 2/10 with medications. AR 180. Dr. Lyon ordered refills of her medications--Avinza, Norco, and Valium. AR 181.

On October 30, 2003, Plaintiff visited Dr. Lyon for a recheck. AR 178-179. Dr. Lyon diagnosed migraine headache, multilevel degenerative disc disease, shoulder pain, and recent facial trauma.[4] AR 178-179. Plaintiff was involved in a fight and was punched in the jaw. AR 178. Dr. Lyon prescribed Naproxen/Naprosyn. AR 179.

On November 17, 2003, Plaintiff sought treatment at the Wellness Clinic for a recheck. AR 175-177. Patrick Rhoades, M.D., diagnosed Plaintiff with moderate to severe degenerative disc disease, mild partial pain syndrome of cervical spine and statement resting musculature with

---

[4] A portion of the diagnosis was missing or illegible.

fibromyalgia, major depression, and perimenopause. AR 176. He prescribed a refill of medications--Avinza, Guaifenesin, Maxalt MLT, Wellbutrin XL, and Zyprexa. AR 176-177.

On November 18, 2003, psychiatrist Vasudeva R. Desai, M.D., prepared a mental medical report regarding Plaintiff to be returned to Robert S. Louis, Plaintiff's attorney. AR 200. Dr. Desai reported treating Plaintiff between June 26, 2002 and January 18, 2003. AR 200. Dr. Desai diagnosed "MDD," agitation, insomnia and chronic pain. AR 200. He opined that Plaintiff's prognosis was guarded. AR 200. Dr. Desai also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form. AR 201-203. He assessed Plaintiff's ability to adjust to a job. AR 201. He opined that Plaintiff had no ability to deal with work stress and poor ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors and maintain attention/concentration. AR 201. He described her limitations as major depressive disorder, generalized anxiety disorder, agitation, and insomnia. AR 201. He opined that Plaintiff had no ability to understand, remember and carry out complex job instructions and poor ability to understand, remember and carry out detailed, but not complex job instructions. AR 202. She also had poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. AR 202. Dr. Desai reported that Plaintiff was unable to get along well with professional colleagues and she was socially withdrawn. AR 202.

On December 1, 2003, Marie Macarubo, M.D., prepared a physical medical report regarding Plaintiff to be returned to Mr. Louis, Plaintiff's attorney. AR 204. Dr. Macarubo diagnosed Plaintiff with fibromyalgia and chronic neck pain. She opined that Plaintiff's prognosis was fair. AR 204. Dr. Macarubo also completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form. AR 205-208. She opined that Plaintiff never could lift or carry. AR 205. She could sit for 4 hours in an 8 hour workday, but could not stand or walk for any hours in an 8 hour workday. AR 206. She never could climb, balance, stoop, crouch, kneel, or crawl. AR 207. She occasionally could reach, handle, feel, and push/pull. AR 207. Plaintiff also had restrictions on heights and moving machinery. AR 208.

On April 1, 2004, Amit Rajguru, M.D., completed a consultative internal medicine examination of Plaintiff. AR 212-214. On physical examination, Plaintiff had decreased range of motion of her cervical spine, forward flexion reduced to 10/50 degrees, extension reduced to 10/60 degrees, rotation to the left and to the right was 20/80 degrees, and lateral flexion was 15/45 degrees bilaterally. AR 213. Plaintiff had significant tenderness to palpation throughout her neck. AR 213. Dr. Rajguru opined that Plaintiff had chronic migraine headaches, chronic hepatitis C without complications, fibromyalgia syndrome, complicated chronic fatigue syndrome, and chronic cervical degenerative disc disease causing chronic pain syndrome in her neck on a frequent/daily basis. AR 214. Dr. Rajguru concluded that Plaintiff had "significant limitations in functional status." AR 214. She could lift and carry 10 pounds both occasionally and routinely, sit without restrictions, and stand and/or walk for about six hours out of an eight hour workday. Pushing and pulling were limited in her upper extremities due to cervical disc disease. Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. AR 214.

Dr. Rajguru also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form. AR 215-218. Dr. Rajguru opined that Plaintiff could lift and/or carry 10 pounds both occasionally and frequently, sit without restrictions, and stand and/or walk for about 6 hours out of an 8-hour workday. AR 215-216. She was limited in pushing and/or pulling in her upper extremities due to cervical degenerative disc disease. AR 216. Plaintiff frequently could engage in postural activities. AR 216. She did not have manipulative, visual, communicative or environmental limitations. AR 217.

On April 29, 2004, psychiatrist Stefan Lampe, M.D., completed a consultative psychiatric examination of Plaintiff. AR 219-220, 223. Dr. Lampe did not have records for review. AR 219. Plaintiff complained to him of chronic neck pain. She reported suffering from depression for approximately 3 years. Her symptoms included poor motivation, poor energy, weight loss, poor appetite, pan-insomnia, helplessness, hopelessness and sad mood. Plaintiff also reported seeing a psychiatrist from 2002 through 2004 and trying numerous medications. AR 219.

Plaintiff took Wellbutrin and continued with depressive symptomology. AR 219. She was not in active treatment. AR 219.

Upon mental status examination, Plaintiff had a dysthymic mood and severely restricted affect. AR 220. She had fair insight and judgment and she was oriented to person, place and situation. AR 220. Dr. Lampe assessed Plaintiff with a severe major depressive disorder, chronic pain and hepatitis C. AR 220. He opined that her prognosis was guarded and he did not believe she would get better in the next 12 months. AR 220. Dr. Lampe concluded that she could handle her own funds, relate and interact with supervisors and co-workers, and understand, remember and carry out simple instructions. She may have some difficulty with technical or complex instructions. AR 220. She would have some difficulty dealing with the public. Dr. Lampe believed that Plaintiff could not maintain concentration and attention for two hour increments or withstand the stress and pressures associated with an eight hour workday on an ongoing basis. AR 223.

Dr. Lampe also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form. AR 221-222. Dr. Lampe opined that Plaintiff had moderate restrictions on her ability to understand and remember detailed instruction, to carry out detailed instructions, and to make judgments on simple work-related decisions. AR 221. She had no restrictions on her ability to interact appropriately with the public, supervisors or co-workers. AR 222. She had marked restrictions on her ability to respond appropriately to work pressures in a usual work setting and moderate restrictions on her ability to respond appropriately to changes in a routine work setting. AR 222. Dr. Lampe also noted that Plaintiff's concentration and consistency were affected by her impairment. AR 222.

On September 14, 2004, Nurse Practitioner Dave Weller completed a mental medical report regarding Plaintiff. AR 225. Nurse Weller reported her treatment history as starting in June 2002 and extending through September 14, 2004. AR 226. He diagnosed Plaintiff as bipolar, with depression, anxiety and insomnia. AR 225. He also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form. AR 226-228. Nurse Weller opined that Plaintiff had poor ability to relate to co-workers, deal with the public, interact

with supervisors, deal with work stress, and function independently. AR 226. She had no ability to understand, remember and carry out complex job instructions or detailed, but not complex job instructions. AR 227. She also had poor ability to behave in an emotionally stable manner or to relate predictably in social situations. AR 227.

<u>ALJ's Findings</u>

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. AR 21. The ALJ also found that Plaintiff had medically determinable impairments of hepatitis C, fibromyalgia, degenerative disc disease, migraine headaches and depression, which were considered "severe" based on the requirements in the Regulations (20 C.F.R. § 404.1520). AR 17, 21. The ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. AR 21. The ALJ further concluded that Plaintiff was unable to perform her past relevant work, but retained the residual functional capacity to perform a significant range of sedentary work. AR 21. The ALJ determined that Plaintiff did not have any impairment or impairments that significantly limited her ability to perform basic work-related activities. AR 21. Therefore, the ALJ found that Plaintiff was not under a disability. AR 22.

**DISCUSSION**

42 U.S.C. § 405(g) authorizes the Court to review administrative decisions in Social Security benefits cases. The fourth sentence of Section 405(g) sets forth one of two exclusive methods by which the Court may remand to the Commissioner of Social Security Administration. *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002). Sentence four provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In essence, a sentence four remand has been characterized as a determination that the agency erred in some respect in reaching a decision to deny benefits. *Akopyan*, 296 F.3d at 854.

"If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay

receipt of benefits, reversal and an award of benefits is appropriate." *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (citation omitted); *see also Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative hearings, or where the record has been thoroughly developed.").

Here, the Commissioner agrees that the Plaintiff's claim for benefits should be remanded for the following reasons:  (1) further evaluation of Plaintiff's credibility in a manner consistent with Social Security Ruling ("SSR") 96-7p; (2) further consideration of the treating and examining medical source opinions, including the opinions of Dr. Desai and Dr. Macarubo; (3) development of the record, including Plaintiff's alleged medical impairments and subjective allegations; and (4) possible medical expert and/or vocational expert testimony to assess Plaintiff's residual functional capacity and vocational ability.  Defendant's Memorandum of Points and Authorities in Support of Motion for Remand ("Memorandum"), at pp. 2 and 3. Plaintiff objects to remand and seeks an award of benefits.  Plaintiff's Opposition to Motion for Remand and Memorandum of Points and Authorities ("Opposition"), at p. 1-2.

The Ninth Circuit's decision in *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996), sets out a three-part test to determine whether it is appropriate to remand for further proceedings or for an award of benefits.  Pursuant to that test, a court should credit improperly rejected evidence and remand for an award of benefits when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting the evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were the evidence credited. *Id.*

1. <u>Legally Insufficient Reasons for Rejecting the Evidence</u>

As to the first part of the test, the Commissioner, by way of seeking remand, tacitly concedes that the ALJ provided insufficient reasons for discrediting the Plaintiff's subjective testimony and the treating and examining physicians' opinions, including the opinions of Dr. Desai and Dr. Macarabo.  Memorandum, at p. 2.  However, the parties disagree as to the second

14

part of the test for remand: whether there are outstanding issues to preclude the Court from making a disability determination on the merits.

2. Outstanding Issues

The Commissioner contends there are unresolved issues of fact requiring further evidence and evaluation, including (1) the weight and sufficiency of the examining and treating physicians' opinions; (2) whether the ALJ must credit Plaintiff's testimony as true; (3) possible medical expert and/or vocational expert testimony to assess Plaintiff's residual functional capacity and vocational ability; and (4) if Plaintiff is found disabled, the onset of her disability. Memorandum, at 2-4. Based on the record and findings in this matter, these outstanding issues must be resolved before a proper determination can be made. *Smolen*, 80 F.3d at 1292.

a. Treating and Examining Medical Source Opinions

The Commissioner seeks remand to allow the ALJ to further consider the treating and examining medical source opinions. A review of the decision indicates that the ALJ gave "little weight" to the opinions of Dr. Macarubo and Dr. Desai. AR 18. This analysis will therefore focus on the ALJ's rejection of Dr. Desai's and Dr. Macarubo's opinions.

With regard to treating medical source opinions, it is true that the medical opinion of a claimant's treating physician is entitled to "special weight." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). Reliance on the opinion of the treating physician is based not only on the fact that he is employed to cure but also on his greater opportunity to observe and know the patient as an individual. However, a treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). An ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate reasons for the rejection supported by evidence in the record. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

In this case, the Commissioner concedes that the ALJ did not provide sufficient consideration of Dr. Desai's and Dr. Macarubo's opinions as treating or examining medical source opinions pursuant to 20 C.F.R. § 404.1527 and SSRs 96-2p and 96-5p. Memorandum, at

p. 2. On review, the ALJ rejected Dr. Desai's and Dr. Macarubo's opinions because there was insufficient evidence that either of these physicians was a treating physician for Plaintiff because (1) their reports were requested by Plaintiff's attorney and (2) they saw Plaintiff for a minimum of two times. AR 17, 18. As to the first ground, the fact that Plaintiff's attorney requested the reports does not support an inference that the physicians did not treat Plaintiff. As to second ground, the evaluations provided by these physicians both indicate the first date of treatment and the most recent date of treatment. AR 200, 204. The ALJ appears to infer that these were the only dates that Dr. Desai and Dr. Macarubo treated Plaintiff. However, the record is not so clear to allow such an inference. There is no indication of when or how often these physicians may have provided treatment to Plaintiff in the interim period between the date of first and last treatment. Plaintiff herself testified that she went to the doctor twice a month and she saw "Dr. Macarovo." AR 31-32. She also testified that she received treatment once a month at Fair Oaks Psychiatric Associates where Dr. Desai is the doctor. AR 33. Dr. Desai talked to her, evaluated her depression, and prescribed medications. AR 33. The ALJ also ascribed "little weight" to Dr. Desai's opinion because there were no mental health treatment records. AR 18. When, as here, the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence, the ALJ has a duty to develop the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ can discharge her duty to develop the record by, among other things, subpoenaing claimant's doctors, or submitting questions to claimant's physicians. *Id.* The ALJ did not develop the record in order to make a sufficient determination of whether Dr. Desai and Dr. Macarubo were treating or examining physicians.

Additionally, the ALJ discredited the evaluations of Dr. Desai and Dr. Macarubo because they were inconsistent with the remainder of the record. AR 18. Even if Dr. Desai and Dr. Macarabo were examining doctors, and not treating doctors, their opinions can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala,* 53 F.3d 1035, 1043 (9th Cir.1995). The ALJ fails to specify how or what evidence establishes the inconsistencies.

b.  Evaluation of Plaintiff's Credibility

An ALJ is required to make specific findings assessing the credibility of a plaintiff's subjective complaints. *Ceguerra v. Sec'y of Health & Human Serv.*, 933 F.2d 735, 738 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. In this case, the Commissioner admits that the ALJ failed to fully and fairly consider Plaintiff's subjective allegations and failed to provide rationale containing specific reasons for her credibility findings. Memorandum, at 2, 3. A remand is proper for reconsideration of credibility determinations to allow an ALJ to make specific credibility findings. *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003) (rejecting argument that "crediting as true" doctrine is mandatory in the Ninth Circuit.)

c.  Medical and/or Vocational Expert Testimony

The Commissioner agrees that a medical or vocational expert may need to be called to consider all of the relevant testimony and/or Plaintiff's restrictions. Where the vocational expert has failed to address a plaintiff's limitations and all the testimony relevant to the case, remand is appropriate. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000). Insofar as Plaintiff contends the VE seemed to testify the limitations found by Dr. Desai would preclude all work, the record is not so clear. Opposition, at p. 2. Although the VE testified that a person would be disabled, he was responding to the following question from Plaintiff's attorney: "Without those (INAUDIBLE) she would be disabled, is that correct?" AR 38-39. The hearing transcript and question from Plaintiff's attorney do not clearly set out the restrictions encompassed in the term "those."

d.  Onset Date

The Commissioner agrees that if disability is found, the ALJ may be required to determine the onset date of such disability. If the Plaintiff ultimately is determined disabled, the timing and duration of her disability is appropriate for a remand. *See, e.g., Bunnell*, 336 F.3d at 1116 (remanding in circumstances where at least one outstanding issue included the timing and duration of disability). In this case, the ALJ concluded that Plaintiff was not disabled. However,

if she is found disabled on remand, her onset date would need to be determined in light of her work record, treatment records and testimony.  The critical time period is after Plaintiff's alleged onset date of June 20, 2000, through the time of the hearing.  Crediting the testimonial evidence and medical opinions as true, the issue would be whether Plaintiff was capable of performing sedentary work during this time as testified by the VE.   The witness testimony indicates that Plaintiff suffered from pain, fatigue, hepatitis-C, degenerative disk disease, back pain, fibromyalgia, and limited range of motion in her neck.  AR 28-29, 30.  However, she was able to perform some work in 2001 and in 2002.  Moreover, there is no evidence in the current record that Plaintiff sought treatment for her symptoms between December 10, 2000 and April 10, 2002.  AR 143, 144.  Subsequent documentary evidence and witness testimony show the development of a major depressive disorder.   AR 28-29, 33, 200, 201-203, 219-220.  The evidentiary record and witness testimony are unclear regarding the onset of her mental health issues, and whether these issues precluded her from all sedentary work for the time period at issue.  Accordingly, this issue would need to be determined by the ALJ.

        3.    <u>ALJ Not Required To Credit the Evidence and Find Plaintiff Disabled</u>.

The third part of the *Smolen* test is whether it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  For reasons already stated, there are outstanding issues of fact, including the medical source status of Dr. Desai and Dr. Macarubo, Plaintiff's credibility, VE testimony, and, if a disability is determined, the potential onset date. With such issues outstanding, it not clear from the record that an ALJ would be required to find the Plaintiff disabled and award disability benefits.

Accordingly, a remand is appropriate and serves a number of purposes: (1) It will allow the ALJ to determine whether to credit the opinions of Dr. Desai and Dr. Macarubo as treating or examining physicians for valid reasons; (2) It will allow the ALJ to make specific, legally sufficient findings regarding Plaintiff's credibility, indicating what testimony is or is not credible based on the evidentiary record; (3) It will allow VE testimony regarding the limitations established by properly credited evidence; and (4) If Plaintiff is found disabled, it will allow the ALJ to determine the length and duration of her disability.

**CONCLUSION**

Based on the foregoing, the Court GRANTS the Commissioner's Motion for Remand. Therefore, the ALJ's decision is REVERSED and the case is REMANDED to the ALJ for further proceedings consistent with this opinion. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Julia McClellan and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    June 21, 2007**                                                  **/s/ John M. Dixon**
                                                                             UNITED STATES MAGISTRATE JUDGE